**Vernon SPENCE, Petitioner,**

v.

**Michael SHEETS, Warden,
Respondent.**

**Case No. 2:08–cv–377.**

United States District Court,
S.D. Ohio,
Eastern Division.

Dec. 18, 2009.

Vernon Spence, Chillicothe, OH, pro se.

Diane Duemmel Mallory, Ohio Attorney General, Columbus, OH, for Respondent.

## OPINION AND ORDER

MICHAEL H. WATSON, District Judge.

On November 25, 2009, the Magistrate Judge issued a *Report and Recommendation* recommending that the instant petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 be dismissed. Although the parties were advised of the right to object to the Magistrate Judge's *Report and Recommendation*, and of the consequences of failing to do so, no objections have been filed.

The *Report and Recommendation* is **ADOPTED** and **AFFIRMED**. This action is hereby **DISMISSED**.

**IT IS SO ORDERED.**

## REPORT AND RECOMMENDATION

NORAH McCANN KING, United States Magistrate Judge.

Petitioner, a state prisoner, brings the instant petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. This matter is before the Court on the petition, Doc. No. 1, as amended, *see* Doc. No. 15, respondent's return of writ, Doc. No. 10, and the exhibits of the parties. For the reasons that follow, the Magistrate Judge **RECOMMENDS** that this action be **DISMISSED**.

## FACTS and PROCEDURAL HISTORY

The Ohio Tenth District Court of Appeals summarized the facts and procedural history of this case as follows:

The following facts are gleaned from the record. In July 2003, Aaron Grexa ("Grexa"), Eric Hlass ("Hlass") and Brandon Conners ("Conners") lived together in a rented house located at 235 East 11th Avenue in Columbus, Franklin County, near the campus of The Ohio State University. Kayla Hurst ("Hurst") was dating Grexa. Grexa was involved in marijuana trafficking and sold the drug from his campus-area home.

In late July 2003, appellant was dating Kristin Woodard ("Woodard"). Woodard's roommate, Amy Reece ("Reece") told appellant about an opportunity to purchase several pounds of marijuana. Appellant expressed interest in the marijuana, so Reece arranged to take appellant to the place of purchase on July 20 or 21, 2003. Appellant and his friend, Kasey Armstrong ("Armstrong") drove in one car and followed another car occupied by Reece and her sister, Melody, to Grexa's home at 235 East 11th Avenue. Reece accompanied appellant and Armstrong into the house.

Reece, Armstrong, and appellant went upstairs with Grexa and Hurst. Grexa, Hurst and Reece went into Grexa's bedroom, while appellant and Armstrong waited in the hall. Grexa removed some marijuana from a suitcase, weighed it using a scale, then called appellant and Armstrong into the room. Upon examining the marijuana, appellant and Armstrong declared that they did not want

to buy it due to its poor quality. Appellant and his group then left the home. Later, appellant telephoned his friend, Todd Bensonhaver ("Bensonhaver") and told him that he wanted Bensonhaver to participate in a robbery that appellant was planning to conduct on July 22, 2003. Appellant told Bensonhaver that he and Armstrong knew where they could steal 25 pounds of marijuana, along with cocaine and ecstasy. Appellant refused to reveal the location of the planned robbery, and later, Bensonhaver agreed to participate. In turn, Bensonhaver contacted Kareem Rahmaan ("Rahmaan"), who also agreed to participate in the robbery. Appellant, Bensonhaver and Rahmaan had been friends for many years.

The three met on July 22, 2003, as planned. They discussed their plan in general terms and appellant revealed the location of the robbery. It was agreed that because appellant had previously been to the home, he would go to the door first in order to gain entry. Later that day, Bensonhaver drove the group to 11th Avenue and parked across the street from the Grexa residence. The three men sat in the car while appellant telephoned Woodard to inquire whether Reece was in Grexa's house. Appellant told Rahmaan that appellant did not want Reece in the house during the robbery. He was unable to determine Reece's whereabouts, however, so the three men left to visit a friend. Eventually, appellant became satisfied that Reece was not in the house, and the men returned, this time parking the car on 10th Avenue.

At 10:55 p.m., using Bensonhaver's cell phone, appellant called Armstrong to tell him that the group was on its way to rob the people at the house where the two had seen the drugs earlier in the week. Appellant was armed with a black, .38–caliber handgun, Rahmaan carried a chrome, .38 caliber handgun, and Bensonhaver was armed with a black, .22 caliber revolver that Rahmaan had obtained for him the day before.

At 11:00 p.m., the three men went to the front door and appellant knocked on the door. A man wearing glasses answered the door, and appellant told the man that he wanted to buy some marijuana, and asked if the man remembered him. The man stated that he did remember appellant (thus, the man was probably Grexa), but informed appellant that he was not selling, or did not have any marijuana for sale. At that point, appellant drew his weapon and backed Grexa into the house.

Rahmaan and Bensonhaver also entered the house, where they encountered Hlass sleeping on the couch. The robbers awakened Hlass and demanded drugs; Grexa and Hlass were very cooperative. When appellant asked them whether anyone else was in the house, Grexa indicated that his girlfriend was upstairs. The group went upstairs, where they found Hurst exiting the north bedroom at the top of the stairs. With his gun still drawn, appellant backed Hurst into that bedroom.

Grexa and Hlass showed Bensonhaver and Rahmaan drugs that were stored in a suitcase in the south bedroom. Bensonhaver held his gun on Grexa and Hlass while Rahmaan retrieved the suitcase. Bensonhaver demanded that Hlass bind Grexa's hands with speaker wire, then demanded money, whereupon Hlass took Bensonhaver back downstairs. Hlass turned over approximately $70–$80 that had been stored in a black trunk by the front door. Bensonhaver then took Hlass back upstairs and into the south bedroom, and tied his hands with speaker wire.

Rahmaan took the suitcase with him while he searched the first floor for more money and drugs, while Bensonhaver remained in the south bedroom with Grexa and Hlass. Bensonhaver called out for appellant, whereupon appellant brought Hurst into the south bedroom. As appellant and Hurst were going toward the south bedroom, Rahmaan was coming upstairs. He saw that Hurst was holding her stomach and crying. Appellant told Rahmaan to tie Hurst, and Rahmaan complied, again using speaker wire. Each victim was bound with his or her hands behind their backs, and their ankles were bound as well.

While Rahmaan was tying Hurst's wrists and ankles, appellant and Bensonhaver were in the hallway. According to Bensonhaver, appellant pulled latex gloves from his pocket and told Bensonhaver that he had to "do it." (Tr., 175, 233.) He explained to Bensonhaver that, "they know me" and "they have to go." (Tr., 175, 233.) As Rahmaan approached Bensonhaver and appellant in the hallway, Rahmaan thought that the other two were having an argument. He told them that the drugs were downstairs and that they should all leave. Appellant told the other two to go, then proceeded toward the south bedroom. Rahmaan and Bensonhaver ran downstairs, grabbed the suitcase containing the drugs, and exited the house through the back door. As they left the house, they heard a gunshot, followed by a second shot. By this time, the two were sprinting down the alley. Ray Lyons ("Lyons"), who lived near 235 East 11th Avenue, testified that at approximately 11:30 or 11:45 p.m. on July 22, 2003, he heard four to six gunshots. After the first two shots were fired, Lyons saw a black man running down the alley behind East 11th Avenue, with a second black man running seconds behind the first. Lyons immediately called 9-1-1 to report the gunshots and the direction that the men were running. For reasons not disclosed in the record, however, authorities did not immediately respond to the scene. At approximately noon on July 23, 2003, Conners, who had spent the night at a friend's house, returned home, discovered the bodies of Hurst, Hlass and Grexa, and immediately called police, who responded moments later.

In the meantime, when they reached Bensonhaver's car, Rahmaan and Bensonhaver put the suitcase in the trunk, then drove around the block and picked appellant up near the alley. Bensonhaver testified that appellant had blood on his face. Rahmaan drove to his home, where the three took the marijuana and money out of the suitcase. Rahmaan gave appellant a clean shirt because appellant had used his shirt to wipe the blood off of his face. Rahmaan testified that they spent no more than 15 or 20 minutes at his home.

While at Rahmaan's home, appellant used Bensonhaver's cell phone to call Armstrong to request a meeting at Mr. Magoo's, a nearby bar. The three left for Mr. Magoo's, with Rahmaan driving his own car, and Bensonhaver and appellant in Bensonhaver's car. On the way, they threw the suitcase in a trash bin near Rahmaan's home, then dropped Bensonhaver's car off at his home, then stopped for five or ten minutes at the home of a man named "Shaw" to pick up some cocaine.

Armstrong testified that when he arrived at Mr. Magoo's, he noticed that appellant, Rahmaan and Bensonhaver all looked "discombobulated." He testified that Bensonhaver looked "a little edgy" and that Rahmaan appeared "like he was having a nervous breakdown." Appellant, he said, looked "[l]ike he nor-

mally looked, just with a stern face. Just sitting there." (Tr., 457.) According to Rahmaan, as the four men sat drinking together, appellant told Armstrong that he, Bensonhaver and Rahmaan had just "hit" the robbery that appellant and Armstrong had discussed earlier. Then, Bensonhaver blurted out to Armstrong that appellant had just killed three people. According to Armstrong, though appellant was seated with the others and heard Bensonhaver's statement, appellant showed no reaction to it.

Armstrong told them that they had just "fucked up" his life by telling him about the murders; then he left Mr. Magoo's. Appellant, Rahmaan and Bensonhaver left Mr. Magoo's and stopped for 10 to 15 minutes at the home of Thomas Hess to buy more drugs, and then they went to another home and smoked marijuana, after which appellant and Bensonhaver played video games until the next morning, while Rahmaan slept on a couch. The next day, Armstrong again met appellant, Bensonhaver and Rahmaan, this time in a parking lot behind an apartment complex. The three tried to sell marijuana to Armstrong, but he refused to buy it because, he said, he knew it was the marijuana taken from the East 11th Avenue apartment where the murders had occurred.

During a conversation that took place about one week after the murders, appellant told Rahmaan that Rahmaan and Bensonhaver did not know that appellant was planning to murder the robbery victims, that he would take responsibility for the murders and that they would not have to "go down" for something that he did.

In late July or early August 2003, appellant tried to sell his portion of the marijuana to Troy Radcliff ("Radcliff"). Appellant told Radcliff that he had obtained the marijuana during a robbery he committed with Bensonhaver and Rahmaan. He also told Radcliff that he shot three people on 11th Avenue, and that he had shot them again when they did not stop moving. When the two saw Hurst's father on television pleading for assistance in solving the case, appellant told Radcliff that he would not be caught. Radcliff went to the authorities with this information in December 2003.

Eventually, appellant sold his portion of the marijuana to Carey Runyan ("Runyan"). Runyan knew that the marijuana had come from the East 11th robbery, and asked appellant what happened that night. Appellant responded that "they knew my face" and that he "had to get rid of them." (Tr., 520.)

Meanwhile, Bensonhaver continued to sell drugs. In the course of a transaction with a confidential informant, which was being recorded, he told the informant that he had been involved in the East 11th robbery and that appellant had killed three people. Rahmaan, too, sold drugs after the robbery. On September 16, 2004, he and Bensonhaver were arrested on federal and state charges. Initially, Bensonhaver refused to cooperate, but later agreed to plea agreements in which he pled guilty in state court to three counts of involuntary manslaughter, one count of aggravated burglary, one count of aggravated robbery and three counts of kidnapping, all with firearm specifications, and pled guilty in federal court to possession and distribution of in excess of 50 grams of cocaine base (commonly referred to as "crack"). He also agreed to tell authorities the truth about the East 11th Avenue robbery and to testify on behalf of the State. In return, he received concurrent sentences for the state and federal charges, with an aggregate term of incarceration of 21 years.

When questioned by police about the robbery, Rahmaan consistently stated that appellant had committed all three murders. He called his girlfriend and directed her to hand over his gun to police. He also called appellant and unsuccessfully attempted to induce appellant to confess to the murders on tape. Later, Rahmaan, too, entered into plea agreements in which he agreed to plead guilty in state court to three counts of involuntary manslaughter, one count of aggravated burglary, one count of aggravated robbery and three counts of kidnapping, all with firearm specifications, and to plead guilty in federal court to possession and distribution of in excess of 50 grams of cocaine base. He agreed to cooperate with authorities and testify on behalf of the State. In exchange, he also received a 21–year aggregate state prison sentence, which was to be served concurrently with his federal sentence.

Following Bensonhaver's and Rahmaan's arrest, appellant called Armstrong and complained that Rahmaan had called him and had talked about "the stuff that happened" on 11th Avenue. Later, Armstrong and his attorney approached the investigating detective and told her what Armstrong knew about the case.

On September 27, 2004, the Franklin County Grand Jury indicted appellant on six counts of aggravated murder with death penalty specifications, one count of aggravated burglary, one count of aggravated robbery and three counts of kidnapping. All counts included firearm specifications. Appellant was later arrested and pled not guilty to all charges. His trial began on July 11, 2005. In addition to the testimony detailed hereinbefore, the jury also heard from police and investigators, a deputy coroner, Reece, Rahmaan's girlfriend, Erica Scott, and Troy Patterson, who spent time in jail with appellant in September 2004.

Patterson testified that appellant told him that he had gone to the Grexa residence to buy marijuana and returned three days later. According to Patterson, appellant then confessed to him that appellant had planned and participated in the robbery, kidnapping and murders of Hurst, Hlass and Grexa, and that he had burned the clothing he was wearing that night and had disposed of the murder weapon in Nelson Creek.

The jury found appellant guilty of all charges, whereupon a separate penalty phase was held, after which the jury recommended a sentence of life in prison without parole. In accordance with the jury's recommendation, the court imposed three consecutive life terms of imprisonment without parole for the aggravated murder counts. The court also sentenced appellant to ten years for each of the remaining counts, all to be served consecutively to each other and to the life terms, plus one three-year term representing all of the firearm specifications, which the court merged into one.

*State v. Spence*, 2006 WL 3438668 (Ohio App. 10th Dist. November 30, 2006). Petitioner raised the following assignments of error on direct appeal:

1. Appellant's convictions were not supported by sufficient evidence and were against he manifest weight of the evidence.

2. The trial court commits reversible error by excluding defense testimony showing a state's witness is a snitch or that his reputation is that of a snitch, thereby denying Appellant his right to a fair trial under the state and federal constitutions.

3. The trial court commits reversible error when it permits the state to exhib-

it photographic evidence to the jury, where the prejudicial value of the evidence is not outweighed by its probative value, thereby denying Appellant's right to a fair trial under the state and federal constitutions.

4. Appellant was denied effective assistance of counsel, in violation of Appellant's 6th and 14th Amendment rights under the federal constitution and Article I, Section 10 of the Ohio Constitution.

5. It was plain error for the trial court to: allow the hearsay testimony of Kasey Armstrong; fail to give the lesser included murder instruction before the jury retired to deliberate; fail to read the instruction on each separate count of aggravated murder for each victim; fail to read the instructions for each count of kidnapping; fail to read all of the verdict forms for each count of aggravated murder; fail to read any of the verdict forms for the charges of aggravated robbery, aggravated burglary and kidnapping; and fail to give the proper "other acts" instruction.

6. The trial court commits reversible error for giving maximum consecutive sentences when there were no facts proven beyond a reasonable doubt to the jury to support giving non-minimum, maximum consecutive sentences.

7. The trial court commits reversible error when it fails to merge three kidnapping counts into the aggravated robbery count of conviction.

*See id.* On November 30, 2006, the appellate court affirmed the trial court's judgment. *Id.* On April 18, 2007, the Ohio Supreme Court dismissed petitioner's subsequent appeal. *State v. Spence*, 113 Ohio St.3d 1468, 864 N.E.2d 654 (2007).

On June 26, 2006, petitioner filed a petition for post conviction relief in which he asserted as follows:

1. At no time can the State of Ohio violate the rights of the said petitioner, Vernon Spence, violating his 5th and 6th amendments.

2. Trial counsel denied the petitioner the right to produce evidence for a Motion for New Trial after being informed of these two affiants, Justen Pumme . . . & Jausha Webb. . . .

3. Trial counsel rendered ineffective assistance denying a right to file a motion for a new trial on many issues that could [have] been raised.

4. Counsel denied petitioner the right to present a witness, Kristen Woodard.

Exhibit 11 to Return of Writ. On May 19, 2006, the trial court denied petitioner's post conviction petition. Exhibit 13 to Return of Writ. Petitioner filed a timely appeal, Exhibits 14, 15 to Return of Writ. However, on September 8, 2006, the appellate court sua sponte dismissed the appeal for failure to file an appellate brief. Exhibit 20 to Return of Writ.

On April 22, 2008, petitioner filed the instant *pro se* petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. He alleges that he is in the custody of the respondent in violation of the Constitution of the United States based upon the following grounds:

1. The petitioner's conviction[s] were not supported by sufficient evidence and were against the manifest weight of evidence.

2. The trial court commits reversible error by excluding defense testimony showing a State witness is a snitch or that his reputation is that of a snitch, thereby denying the petitioner his right to a fair trial under State and Federal Constitutions.

3. The trial court commits reversible error when it permits the State to exhibit photographic evidence to the jury, where the prejudicial value of the evi-

dence is not outweighed by its probative value, thereby denying petitioner's right to a fair trial under the State and Federal Constitutions.

4. Petitioner was denied effective assistance of counsel, in violation of petitioner's 6th and 14th Amendment rights under the federal constitution and Article I, Section 10 of the Ohio Constitution. . . .

5. It was plain error for the trial court to: allow the hearsay testimony of Kasey Armstrong; failed to give the lesser included murder instruction before the jury retired to deliberate; failed to read the instruction on each separate count of aggravated murder for each victim; failed to read the instructions for each count of kidnapping; failed to read all of the verdict forms for each count of aggravated murder; failed to read any of the verdict forms for the charges of aggravated robbery, aggravated burglary and kidnapping; and failed to give a proper "other acts" instruction.

6. The trial court commits reversible error for giving maximum consecutive sentences when there were not facts proven beyond a reasonable doubt to the jury to support giving non-minimum, consecutive sentences. . . .

7. The trial court commits reversible error when it fails to merge three kidnapping counts into the aggravated robbery count of conviction.

8. State misconduct when the petitioner had a right to counsel during when the State planted a[n] informant Troy Patterson, in violation of the petitioner['s] 5th and 6th Amendment rights.

9. Ineffective assistance of trial counsels when they failed to interview inmates at the county jail who was willing to testify that the petitioner was used as a scapegoat and wrongfully convicted. Justen Pumme . . . and Jausha Webb . . . testimony is very important to a

case where there isn't any direct evidence linking the petitioner to this crime, other than the two codefendants who plead guilty as charge[d] . . . .

10. Trial court abused its discretion when it failed to issue findings of fact and conclusions of law.

11. State post conviction is an inadequate remedy.

On July 11, 2008, petitioner amended his petition to include the following additional claims:

12. The trial court commits reversible error for giving the maximum consecutive sentences when there were no facts proven beyond a reasonable doubt to the jury to support giving non-minimum, consecutive sentences.

13. The trial court commits reversible error when it failed to merge three kidnapping counts into the aggravated robbery count of the conviction.

Doc. No. 6. It is the position of the respondent that petitioner's claims are without merit or are procedurally defaulted.

## CLAIM ONE

■■■■ In claim one, petitioner asserts that the evidence was constitutionally insufficient to sustain his convictions, and that his convictions were against the manifest weight of the evidence. Petitioner's claim that his convictions were against the manifest weight of the evidence fails to present an issue that is appropriate for federal habeas corpus relief. The Due Process Clause does not provide relief for defendants whose convictions are against the manifest weight of the evidence, but only for those who have been convicted without enough proof to allow a rational trier of fact to find guilt beyond a reasonable doubt. *Walker v. Engle*, 703 F.2d 959, 969 (6th Cir.1983). In the context of a claim alleging a violation of due process, "sufficiency of the evidence" refers to the

due process requirement that there be enough evidence introduced in favor of the prosecution for a rational trier of fact to find teach element of the crime beyond a reasonable doubt. *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). In reviewing a sufficiency of the evidence claim, a federal habeas court must defer to the trier of fact with respect to issues of conflicting testimony, weight of the evidence, and the credibility of the witnesses. *Jackson,* 443 U.S. at 319, 99 S.Ct. 2781; *Walker,* 703 F.2d at 969.

■ However, under Ohio law, a claim that a verdict was against the manifest weight of the evidence—as opposed to one based upon insufficient evidence—requires the appellate court to act as a "thirteenth juror" and review the entire record, weight the evidence, and consider the credibility of witnesses to determine whether "the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *State v. Martin,* 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1983); *cf. Tibbs v. Florida,* 457 U.S. 31, 102 S.Ct. 2211, 72 L.Ed.2d 652 (1982). Since a federal habeas court does not function as an additional state appellate court, vested with the authority to conduct such an exhaustive review, any claim that petitioner's conviction was against the manifest weight of the evidence cannot be considered by this Court.

■ Petitioner does assert that the evidence was constitutionally insufficient to sustain his convictions. Petitioner does not dispute the factual findings of the state appellate court. He complains that he was convicted on the testimony of "two self admitted killers" and that there was no fingerprint evidence. *See Petition.* The state appellate court rejected this claim in relevant part as follows:

Appellant's sole argument in support of his evidentiary sufficiency challenge consists in his contention that the testimony of the State's witnesses who implicated him in the murders, or who testified that appellant made inculpatory statements, was so completely unreliable that his convictions are unsupported by sufficient evidence. Appellant does not argue that any particular element of any of his convictions was unsupported by sufficient evidence; he focuses solely on the unreliability of the State's evidence *in toto.*

He argues that both Bensonhaver and Rahmaan were strongly motivated to lie because they were facing federal drug charges as well as state charges arising from the murders, and both had criminal records. He argues that the authorities' evidence gathering and pursuit of drug charges against the two men resulted in their testimony being tainted by coercion. Appellant also argues that the other witnesses who implicated him were "all convicted felons and given substantial reductions in pending charges or granted immunity for past drug dealing crimes, to testify against appellant."

The testimony of these witnesses as to appellant's involvement in the murders, he argues, was so inherently unreliable that it was insufficient to prove his guilty beyond a reasonable doubt. "This contention, however, calls for an evaluation of [the witnesses'] credibility, which is not proper on review of evidentiary sufficiency." *State v. Drummond,* 111 Ohio St.3d 14, 2006–Ohio–5084, 854 N.E.2d 1038, ¶ 200, citing *State v. Yarbrough,* 95 Ohio St.3d 227, 2002–Ohio–2126, 767 N.E.2d 216, ¶ 79.

Appellant was convicted of three counts of aggravated murder, in violation of R.C. 2903.01(A), which provides, "No person shall purposely, and with prior calculation and design, cause the death

of another * * *." "A person acts purposely when it is his specific intention to cause a certain result, or, when the gist of the offense is a prohibition against conduct of a certain nature, regardless of what the offender intends to accomplish thereby, it is his specific intention to engage in conduct of that nature." R.C. 2901.22(A).

"Prior calculation and design can be found even when the killer quickly conceived and executed the plan to kill within a few minutes." *State v. Coley* (2001), 93 Ohio St.3d 253, 264, 754 N.E.2d 1129. In *State v. Carson*, 10th Dist. No. 05AP–13, 2006–Ohio–2440 [2006 WL 1351493], we recently explained:

> Prior calculation and design requires something more than instantaneous deliberation. Where evidence adduced at trial reveals the presence of sufficient time and opportunity for the planning of an act of homicide to constitute prior calculation, and the circumstances surrounding the homicide show a scheme designed to implement the calculated decision to kill, a finding by the trier of fact of prior calculation and design is justified.

*Id.* at ¶ 24. (Citations omitted.)

Appellant was also convicted of three counts of kidnapping in violation of R.C. 2905.01(A)(2), which provides, "No person, by force, threat, or deception, * * * shall remove another from the place where the other person is found or restrain the liberty of the other person, for any of the following purposes: * * * To facilitate the commission of any felony or flight thereafter[.]"

Appellant was also convicted of one count of aggravated burglary in violation of R.C. 2911.11(A), which provides:

> No person, by force, stealth, or deception, shall trespass in an occupied structure or in a separately secured or separately occupied portion of an oc-cupied structure, when another person other than an accomplice of the offender is present, with purpose to commit in the structure or in the separately secured or separately occupied portion of the structure any criminal offense, if any of the following apply:
>
> (1) The offender inflicts, or attempts or threatens to inflict physical harm on another;
>
> (2) The offender has a deadly weapon or dangerous ordnance on or about the offender's person or under the offender's control.

Appellant was also convicted of aggravated robbery in violation of R.C. 2911.01(A), which provides:

> No person, in attempting or committing a theft offense, as defined in section 2913.01 of the Revised Code, or in fleeing immediately after the attempt or offense, shall do any of the following:
>
> (1) Have a deadly weapon on or about the offender's person or under the offender's control and either display the weapon, brandish it, indicate that the offender possesses it, or use it;
>
> (2) Have a dangerous ordnance on or about the offender's person or under the offender's control;
>
> (3) Inflict, or attempt to inflict, serious physical harm on another.

Having reviewed the elements of each and every offense of which appellant was convicted, as well as all of the evidence adduced at trial, we conclude that appellant's convictions are supported by sufficient evidence. Bensonhaver's and Rahmaan's eyewitness testimony, along with appellant's confessions to others, constitutes sufficient evidence of every element of each of appellant's offenses of conviction.

*State v. Spence,* 2006 WL 3438668 (Ohio App. 10th Dist. November 30, 2006)(footnote omitted).

Petitioner's federal habeas corpus petition is governed by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). *See Lindh v. Murphy,* 521 U.S. 320, 336, 117 S.Ct. 2059, 138 L.Ed.2d 481 (1997); *Harpster v. Ohio,* 128 F.3d 322, 326 (6th Cir.1997). Under 28 U.S.C. § 2254(e)(1), the state court's factual findings are entitled to a presumption of correctness:

> In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.

Additionally, the state court's decision is binding on this Court unless that decision is contrary to or involves an unreasonable application of clearly established federal law as determined by the United States Supreme Court:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based upon an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

> Under the "contrary to" clause, a federal habeas court may grant the writ if the

state court arrives at a conclusion opposite to that reached by [the United States Supreme Court] on a question of law or if the state court decides a case differently than [the United States Supreme Court] has on a set of materially indistinguishable facts. Under the "unreasonable application" clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the United States Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.

*Williams v. Taylor,* 529 U.S. 362, 412–13, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000). Petitioner has failed to meet this standard here.

Upon review of the record, and for the reasons detailed by the state appellate court, this Court likewise concludes that, viewing all of the evidence in the light most favorable to the prosecution, see *Jackson v. Virginia, supra,* the evidence was constitutionally sufficient to sustain petitioner's convictions.

Claim one is without merit.

## CLAIMS TWO AND THREE

■ Claims two and three challenge certain evidentiary rulings by the state trial court. In claim two, petitioner asserts that the trial court improperly excluded testimony of David Braine that prosecution witness Troy Patterson had a reputation as a snitch. In claim three, petitioner asserts that he was denied a fair trial because the trial court admitted into evidence allegedly prejudicial photographs of blood-stained underwear "to inflame the passion of the jury that a rape took place by allowing such testimony from the self admitted killers." *Petition,* at 6. Respondent contends that both of the foregoing claims are waived because petitioner failed

to present such claims to the state courts as federal constitutional issues.

In order to satisfy the exhaustion requirement in habeas corpus, a petitioner must fairly present the substance of each constitutional claim to the state courts as a federal constitutional claim. *Anderson v. Harless,* 459 U.S. 4, 6, 103 S.Ct. 276, 74 L.Ed.2d 3 (1982); *Picard v. Connor,* 404 U.S. 270, 275, 92 S.Ct. 509, 30 L.Ed.2d 438 (1971). Although the fair presentment requirement is a rule of comity, not jurisdiction, *see Castille v. Peoples,* 489 U.S. 346, 349, 109 S.Ct. 1056, 103 L.Ed.2d 380 (1989); *O'Sullivan v. Boerckel,* 526 U.S. 838, 844–45, 119 S.Ct. 1728, 144 L.Ed.2d 1 (1999), it is rooted in principles of comity and federalism designed to allow state courts the opportunity to correct the State's alleged violation of a federal constitutional right that threatens to invalidate a state criminal judgment. In the Sixth Circuit, a petitioner can satisfy the fair presentment requirement in any one of four ways: (1) reliance upon federal cases employing constitutional analysis; (2) reliance upon state cases employing federal constitutional analysis; (3) phrasing the claim in terms of constitutional law or in terms sufficiently particular to allege a denial of a specific constitutional right; or (4) alleging facts well within the mainstream of constitutional law. *McMeans v. Brigano,* 228 F.3d 674, 681 (6th Cir.2000). Further, general allegations of the denial of a constitutional right, such as the right to a fair trial or to due process, are insufficient to satisfy the "fair presentment" requirement. *Id.*

Petitioner referred to the federal and state constitutions in presenting claims two and three to the state courts; however, in his appellate brief, he argued the issues only as an alleged violation of state evidentiary rules. He did not refer to any federal or state cases relying on federal law in support of these claims. *See Exhib-*

*it 4 to Return of Writ.* Therefore, to the extent that petitioner intends to raise, in clams two and three, a federal constitutional issue, he has failed to establish cause for his failure to present such federal claim to the state courts. He has thereby waived these claims for federal habeas corpus review.

Further, petitioner's claims challenging the trial court's evidentiary rulings do not warrant habeas corpus relief. The state appellate court rejected these claims as follows:

[A]ppellant's proffer reveals that Braine had been in jail with Patterson and would have testified that he was familiar with Patterson's reputation among inmates as a "snitch." Appellant argues that he should have been allowed to present Braine's testimony because it, together with the fact that Patterson was a party to a plea agreement on a drug case, would have been probative of the issue whether Patterson was truthful or untruthful when he testified against appellant. He argues that he has a right to try to demonstrate that a state's witness has a motive to lie and that Braine's testimony would have been part of an attempt to prove that Patterson was lying by showing that he has a reputation for "snitching."

Appellant argues that Patterson's history of snitching is essential to his claim that Patterson lied. He contends that Patterson's reputation as a snitch demonstrates his penchant for lying because "[s]nitches, by reputation, are not trustworthy people[,]" and "[t]he dubious nature of information given by a snitch is a common understanding[.]" Appellant also argues that Braine's testimony was offered to impeach Patterson's denial, during cross-examination, that he has a reputation as a snitch.

Appellant contends that he was entitled to present Braine's testimony pursuant to Evid.R. 404(B), 405, 608 and 616. Evid.R. 404(B) provides that evidence of other acts may be admissible for proof of bias or motive. Evid.R. 405 allows a party to prove character or a trait of a person through testimony as to reputation, and allows proof by specific instances of conduct when the character or trait is essential to a claim such as, in this case, a claim that a witness is biased or has a motive to lie. Evid.R. 608(A) governs evidence of the reputation of a witness for a particular character, such as truthfulness. Evid.R. 616 allows a witness to be impeached for bias or motive to misrepresent using extrinsic evidence.

In response, the State argues that appellant's proffered reputation evidence was inadmissible because Patterson's reputation as a snitch, if any, would not establish that Patterson had a motive to lie in *appellant's* case, or that Patterson was biased against *appellant.* The record discloses that Patterson did not know appellant prior to being incarcerated with him and Patterson received no benefits for testifying in appellant's case. FN4 On these facts, the State argues, Patterson's general reputation for providing assistance to the government would not have demonstrated that Patterson had a motive to lie during his testimony against appellant, or that Patterson had a particular bias against appellant.

> FN4. According to the State, Patterson was a party to a plea agreement, but that was in connection with a case in federal court and was unrelated to the present case. Our review of the record reveals no evidence of the terms of Patterson's federal plea agreement. Without such evidence we cannot assume that the agreement involved his testimony in the present

case. There is no other evidence in the record to indicate that Patterson received any benefit in exchange for testifying against appellant.

We note initially that the admission or exclusion of relevant evidence is a matter within the sound discretion of the trial court. *State v. Ketterer,* 111 Ohio St.3d 70, 855 N.E.2d 48, 2006–Ohio–5283, ¶ 126. The judgment of the trial court in this regard will not be reversed absent an abuse of that discretion and clear prejudice to the defendant resulting therefrom. *State v. Hymore* (1967), 9 Ohio St.2d 122, 128, 38 O.O.2d 298, 224 N.E.2d 126.

Evid.R. 608(A) provides, "[t]he credibility of a witness may be attacked or supported by evidence in the form of opinion or reputation, * * * [as] to character for truthfulness or untruthfulness[.]" In order for this court to find that Braine's testimony was admissible pursuant to Evid.R. 608(A), we would be required to accept the notion that cooperation with authorities in the criminal prosecution of fellow inmates equates to being untruthful. We do not accept this proposition, and appellant has provided no authority to persuade us to conclude otherwise. Evid.R. 404(B) likewise does not permit the admission of Braine's testimony that Patterson was a reputed snitch. That rule allows evidence of other "acts" to be admitted to prove, as relevant here, motive. First, evidence that Patterson has a reputation as a snitch does not prove that he committed any specific "acts" of snitching, though it may support the inference that he has cooperated with authorities. More importantly, however, even if Patterson's reputation as a jailhouse snitch proves that he has *provided information* to authorities in other cases, it does not equate to proof of a *motive for Patterson to lie* during his testimony against appellant. Again,

such a connection requires the acceptance of the underlying premise that cooperating with authorities in criminal prosecutions in order to garner favorable treatment for oneself equates to being untruthful, and we do not accept that premise. Finally, other "acts" of testifying against fellow inmates do not demonstrate that Patterson had a motive to *lie* in appellant's case, or that he had a particular bias against appellant. Evid.R. 405, which allows reputation testimony to be used as evidence of character or a trait of character of a person, also does not support appellant's argument because the most that Braine's testimony proves is that Patterson is a cooperator with the government; it does not prove that Patterson is a liar.

It is true, as appellant points out, that Evid.R. 616(A) allows a party to impeach a witness using extrinsic evidence to demonstrate bias or motive to misrepresent, but as discussed above with respect to Evid.R. 405, extrinsic evidence of Patterson's reputation for cooperating with authorities in other cases in exchange for favorable treatment does not, alone, demonstrate any bias against appellant or motive to misrepresent the facts in the present case. There was no proffer that Braine would have testified that Patterson had lied or otherwise had been less than completely truthful in any testimony he gave in other cases.

Evid.R. 616(C) allows impeachment by extrinsic evidence that contradicts a witness' testimony, but only if such extrinsic evidence is permitted by Evid.R. 608(A), 609, 613, 616(A) or (B), or 706, or by the common law of impeachment not in conflict with the Rules of Evidence. Evid.R. 616(C)(1) and (2). Braine's proffered testimony would have contradicted Patterson's denial, during cross-examination, that he had a reputation as a snitch, but Braine's statements are not admissible under any of the rules enumerated in Evid. R. 616(C)(1) and (2); therefore, Evid.R. 616 does not support appellant's argument that the trial court erred in refusing to allow Braine to testify.

Because Braine's proffered testimony was inadmissible we conclude that the trial court did not abuse its discretion in refusing to admit it, and we overrule appellant's second assignment of error.

Photographic Evidence

In support of his third assignment of error, appellant argues that the trial court erred in admitting State's Exhibits 1–B138 and 1–B139. These exhibits are photographs taken on the day that the bodies of Hlass, Hurst and Grexa were discovered. They depict a portion of the floor of the south bedroom, directly underneath the victims' bodies, as that area appeared immediately after the bodies were removed. Exhibit 1–B138 was taken at a greater distance from the floor, while Exhibit 1–B139 is a close-up of part of the same area of the floor depicted in State's Exhibit 1–B138.

Both exhibits depict a patterned rug covering the wood floor; the rug has been stained with blood. Both exhibits depict a pair of red panties that are rolled up as if they had been deposited on the floor after having been worn. The upward-facing surfaces of the panties appear to be stained with blood. The panties are located a few inches away from a dark pool of blood on the rug.

While acknowledging that crime scene photos depicting blood left at the scene are relevant and otherwise unobjectionable, appellant argues that, because they include depictions of the red panties, State's Exhibits 1–B138 and 1–B139 should not have been admitted because their probative value was outweighed by the danger that their admission would

unfairly prejudice appellant or would mislead the jury. He points out that on several occasions at trial prosecution witnesses expressed concern over whether Hurst was sexually assaulted. Since the jury heard each and every one of those references, and because the red panties "ostensibly" belonged to Hurst, appellant argues, the photographs unfairly imply that appellant sexually assaulted Hurst, thereby creating a risk of unfair prejudice that outweighs the probative value of the photographs. He also argues that the photographs confused the issues for the jury, given that appellant had not been charged with a sexual assault.

Rule 403(A) of the Ohio Rules of Evidence provides, "[a]lthough relevant, evidence is not admissible if its probative value is substantially outweighed by the danger of unfair prejudice, of confusion of the issues, or of misleading the jury." Decisions on the admissibility of photographs rest within the sound discretion of the trial court. *State v. Craig,* 110 Ohio St.3d 306, 2006–Ohio–4571, 853 N.E.2d 621, ¶ 90.

"The issue of whether testimony is relevant or irrelevant, confusing or misleading, is best decided by the trial judge who is in a significantly better position to analyze the impact of the evidence on the jury." *Columbus v. Taylor* (1988), 39 Ohio St.3d 162, 164, 529 N.E.2d 1382, rehearing denied, 40 Ohio St.3d 707, 534 N.E.2d 850. Thus, "[w]e will not interfere with the trial court's balancing of probativeness and prejudice 'unless it has clearly abused its discretion and the defendant has been materially prejudiced thereby * * *.' " *State v. Slagle* (1992), 65 Ohio St.3d 597, 602, 605 N.E.2d 916, quoting *State v. Hymore* (1967), 9 Ohio St.2d 122, 128, 38 O.O.2d 298, 224 N.E.2d 126.

We have thoroughly examined the record for implications that Hurst had been sexually assaulted. Both Rahmaan and Bensonhaver recalled that, after they had tied up Hlass and Grexa, Hurst and appellant emerged from the bedroom in which Hurst had been sleeping prior to the trio's arrival. Bensonhaver recalled that Hurst was crying and holding her stomach. Rahmaan recalled that Hurst was "emotional" but was not "running and screaming and stuff like that." (Tr., 313.) But the fact that Hurst was emotional and was holding her stomach does not lead to the conclusion that she had been raped. It is, however, a reasonable indication that she was terrified at being held against her will by three armed men who wanted drugs and money.

Appellant also directs our attention to Bensonhaver's testimony, in which he recalls that when police initially questioned him, they played for him a tape recording of a conversation between Bensonhaver and the confidential informant to whom Bensonhaver had sold drugs. Bensonhaver admitted that the tape reveals he told the confidential informant about the robbery and the murders, and he told him that he thought appellant had raped Hurst.

Finally, appellant points to part of the record in which *defense counsel* inquired whether Rahmaan recalled an interview during which Columbus Police Detective McCoskey told Rahmaan that he and Bensonhaver:

" * * * had no intention of going in that house and killing anybody, just going in to be an easy lick, get the money, get the weed and get out of there. But one guy can't. He got to take down the girl in the other room while the two guys had nothing to do with that. In fact, didn't want anything to do with that and the guys say they got to go, man. And so the two guys take off out of the house

and are seen by witnesses. And after that, things go terribly wrong."
(Tr., 406–407.)

There was no transcript of the detective's statement paraphrased by defense counsel, and counsel never asked Rahmaan to clarify what he thought "take down the girl" meant, nor did Rahmaan ever clarify what he thought the statement meant. The statement is not Rahmaan's, nor did Rahmaan expressly adopt it. Moreover, the detective's statement does not constitute evidence that appellant sexually assaulted Hurst, or that Rahmaan believed that he had. The State directs our attention to Bensonhaver's testimony that, while he and appellant were at Mr. Magoo's on the night of the murders, Bensonhaver asked appellant whether he raped Hurst, and appellant swore "on his kids' life" that he did not rape her. (Tr., 188.) There was no objection to this testimony. We also note that the jury was given State's Exhibit 5–E, the Franklin County Coroner's Report and Findings of Fact and Verdict prepared following an autopsy of Hurst's body. The report specifically notes that a rape examination was performed and the external genitalia were examined and found to be atraumatic. (State's Exhibit 5–E, at 4.) Under the section of the report entitled "Evidence of Injury" the report lists two gunshot wounds, two superficial skin abrasions to the face and bruises around the eyes, but makes no mention of any sexual assault-related injury.

We note, as the trial court did, that the bedroom in which the bodies were found (as well as the other rooms pictured in the State's exhibits) contained many clothing items strewn on the floor, beds, and other furniture items, and in laundry baskets. This renders unpersuasive appellant's argument that the panties must have belonged to Hurst or that their presence near the bodies would have led the jury to believe that a rape had occurred.

Moreover, the balance of the record does not contain implications that appellant sexually assaulted Hurst such that the photographs of the panties, taken together with the rest of the record, would unfairly prejudice appellant or confuse the jury. Other than Bensonhaver's unsubstantiated belief expressed to the confidential informant, the only affirmative references to rape are appellant's firm *denial* of having raped Hurst, and the autopsy report indicating that Hurst was *not* raped. The record indicates that Hurst was crying and holding her stomach as she walked down the hall toward the south bedroom, but this does not imply that she had been sexually assaulted; moreover, panties found in the *south bedroom*, even if it had been proven that they belonged to Hurst, would not help to establish that Hurst had been raped while in the *other* bedroom.

State's Exhibits 1–B138 and 1–B139 were relevant because they showed the amount of blood that remained on the rug after removal of the victims' bodies. This connects appellant to the murders in light of the testimony that he emerged from the house with enough blood on his face that, after using his shirt to wipe his face, he needed to change into one of Rahmaan's shirts before going to Mr. Magoo's.

Upon a thorough review of the record we find no abuse of discretion in the trial court's admission of State's Exhibits 1–B138 and 1–B139. Accordingly, we overrule appellant's third assignment of error.

*State v. Spence, supra,* 2006 WL 3438668.

As a general matter, errors of state law, especially the improper admission of evidence, do not support a writ of

habeas corpus. *See Estelle v. McGuire,* 502 U.S. 62, 112 S.Ct. 475, 116 L.Ed.2d 385 (1991); *see also Giles v. Schotten,* 449 F.3d 698, 704 (6th Cir.2006). To be entitled to habeas relief, a petitioner must demonstrate that an evidentiary ruling violated more than a state rule of evidence or procedure. In order to prevail, a petitioner must show that the evidentiary ruling was "so egregious that it resulted in a denial of fundamental fairness." *Giles,* 449 F.3d at 704 (citing *Baze v. Parker,* 371 F.3d 310, 324 (6th Cir.2004)). Stated differently, " '[e]rrors by a state court in the admission of evidence are not cognizable in habeas proceedings unless they so perniciously affect the prosecution of a criminal case as to deny the defendant the fundamental right to a fair trial.' " *Biros v. Bagley,* 422 F.3d 379, 391 (6th Cir.2006) (citing *Roe v. Baker,* 316 F.3d 557, 567 (6th Cir.2002)). A state court evidentiary ruling does not violate due process unless it "offend[s] some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental.' " *Giles,* 449 F.3d at 704 (citing *Coleman v. Mitchell,* 268 F.3d 417, 439 (6th Cir.2001)). The record fails to reflect such circumstances here.

## CLAIMS FOUR AND FIVE

In claim four, petitioner asserts that he was denied the effective assistance of counsel because his attorney failed to object to hearsay testimony by Kasey Armstrong that Bensonhaver had told Armstrong at Mr. Magoo's bar that petitioner had shot three people; failed to object to the trial court's failure to instruct the jury on the lesser included offense of murder and on each separate charge of aggravated murder and each count of kidnapping and failure to read all of the verdict forms for each count of aggravated murder and none of the verdict forms for charges of aggravated robbery, burglary, and kidnapping; and failed to request a jury instruction on

other acts evidence. In claim five, petitioner asserts that the foregoing errors constituted plain error. Respondent contends that these claims have been procedurally defaulted or are without merit.

■ In recognition of the equal obligation of the state courts to protect the constitutional rights of criminal defendants, and in order to prevent needless friction between the state and federal courts, a state criminal defendant with federal constitutional claims is required fairly to present those claims to the highest court of the state for consideration. 28 U.S.C. § 2254(b), (c). If he fails to do so, but still has an avenue open to him by which he may present the claims, his petition is subject to dismissal for failure to exhaust state remedies. *Id.; Anderson v. Harless,* 459 U.S. 4, 6, 103 S.Ct. 276, 74 L.Ed.2d 3 (1982) (*per curiam*); *Picard v. Connor,* 404 U.S. 270, 275–76, 92 S.Ct. 509, 30 L.Ed.2d 438 (1971). If, because of a procedural default, the petitioner can no longer present his claims to a state court, he has also waived them for purposes of federal habeas review unless he can demonstrate cause for the procedural default and actual prejudice resulting from the alleged constitutional error. *Murray v. Carrier,* 477 U.S. 478, 485, 106 S.Ct. 2639, 91 L.Ed.2d 397 (1986); *Engle v. Isaac,* 456 U.S. 107, 129, 102 S.Ct. 1558, 71 L.Ed.2d 783 (1982); *Wainwright v. Sykes,* 433 U.S. 72, 87, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977).

■ In the Sixth Circuit, a four-part analysis must be undertaken when the state argues that a federal habeas claim is precluded by the petitioner's failure to observe a state procedural rule. *Maupin v. Smith,* 785 F.2d 135, 138 (6th Cir.1986). "First, the court must determine that there is a state procedural rule that is applicable to the petitioner's claim and that the petitioner failed to comply with

the rule." *Id.* Second, the Court must determine whether the state courts actually enforced the state procedural sanction. *Id.* Third, it must be decided whether the state procedural forfeiture is an 'adequate and independent' state ground on which the state can rely to foreclose review of a federal constitutional claim. *Id.* Finally, if the Court has determined that a state procedural rule was not complied with and that the rule was an adequate and independent state ground, then the petitioner must demonstrate that there was cause for him not to follow the procedural rule and that he was actually prejudiced by the alleged constitutional error. *Id.*

The state appellate court rejected claims four and five as follows:

Appellant's fourth and fifth assignments of error present interrelated issues and will be addressed together. In support of his fourth and fifth assignments of error, respectively, he argues that he received ineffective assistance of counsel when counsel failed to object, and that the trial court committed plain error, when the following claimed errors occurred: (1) Armstrong gave hearsay testimony; (2) the trial court gave the wrong "other acts" instruction; (3) the trial court failed to read the instructions related to aggravated murder three separate times, corresponding to each victim; (4) the trial court failed to read to the jury the instructions for each separate count of kidnapping, corresponding to each victim; (5) the trial court failed to read to the jury all of the verdict forms corresponding to each count of aggravated murder; (6) the trial court failed to read to the jury any of the verdict forms corresponding to the counts of aggravated robbery, aggravated burglary and kidnapping; and (7) the trial court failed to charge the jury on the lesser included offense of murder before the jury retired to deliberate.

To prove ineffective assistance of counsel, defendant must show that counsel's performance was deficient. *Strickland v. Washington* (1984), 466 U.S. 668, 686, 104 S.Ct. 2052, 80 L.Ed.2d 674. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed a defendant by the Sixth Amendment to the United States Constitution. *Ibid.* The defendant must then show that counsel's deficient performance prejudiced his defense. *Ibid.* This requires demonstrating that, but for counsel's unprofessional errors, the result of the trial would have been different. *Id.* at 694 [104 S.Ct. 2052].

"Judicial scrutiny of counsel's performance must be highly deferential." *Id.* at 689 [104 S.Ct. 2052]. A properly licensed attorney is presumed competent, and the burden of proving ineffectiveness is on the defendant. *State v. Smith* (1985), 17 Ohio St.3d 98, 100, 17 OBR 219, 477 N.E.2d 1128. Counsel's actions that "might be considered sound trial strategy" are presumed effective. *Strickland, supra,* at 689 [466 U.S. 668] "Prejudice" exists only when counsel's performance renders the result of the trial unreliable or the proceeding unfair. *Ibid.* The accused must demonstrate a reasonable probability that a different verdict would have been returned but for counsel's deficiencies. *Id.* at 694 [104 S.Ct. 2052]. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Ibid.*

An error is plain error only if it is obvious, *State v. Barnes* (2002), 94 Ohio St.3d 21, 27, 759 N.E.2d 1240, and, "but for the error, the outcome of the trial clearly would have been otherwise." *State v. Long* (1978), 53 Ohio St.2d 91, 7 O.O.3d 178, 372 N.E.2d 804, paragraph two of the syllabus.

Appellant argues that the trial court committed plain error in allowing Armstrong to testify that Bensonhaver told him at Mr. Magoo's that appellant had shot the victims; he also argues that he received ineffective assistance of counsel when his attorneys failed to object to this testimony.

In response, the State argues that Bensonhaver's statement is not hearsay pursuant to Evid.R. 801(D)(1)(b), which provides, "[a] statement is not hearsay if * * * [t]he declarant testifies at the trial or hearing and is subject to cross-examination concerning the statement, and the statement is * * * consistent with his testimony and is offered to rebut an express or implied charge against him of recent fabrication or improper influence or motive." We agree. This rule permits "rehabilitation of a witness whose credibility has been attacked by means of a charge that he recently fabricated his story or falsified his testimony in response to improper motive or influence, by admitting into evidence a consistent statement made by the witness prior to the time of the suggested invention or of the emergence of the motive or influence to invent or falsify, as tending to rebut the charge." *Motorists Mut. Ins. Co. v. Vance* (1985), 21 Ohio App.3d 205, 207, 21 OBR 219, 486 N.E.2d 1206.

In the present case, the nearly singular focus of appellant's cross examination of Bensonhaver was Bensonhaver's alleged motive to fabricate his implication of appellant to save himself from prosecution for the aggravated murders of Grexa, Hlass and Hurst. Defense questioning of Bensonhaver clearly reveals a strategy to charge that police confronted Bensonhaver with an "it's either him or you" scenario in which Bensonhaver could either implicate appellant or face the death penalty himself. Later, when Armstrong testified, the state was enti-

tled to solicit Armstrong's testimony that, within hours following the murders, Bensonhaver made a statement that is consistent with the testimony he gave at trial. Evid.R. 801(D)(1)(b) allows such rehabilitation. As such, counsel was not deficient in failing to object to Armstrong's testimony, and the trial court committed no error in allowing it.

Appellant argues that the trial court erred to his prejudice in giving the jury an incorrect and ambiguous instruction on the use of "other acts" evidence, and that counsel was ineffective for failing to object. The court read from the standard other acts instruction found at OJI § 402.61, which states:

> Evidence was received about the commission of (crime[s]) (wrong[s]) (act[s]) other than the offense(s) with which the defendant is charged in this trial. That evidence was received only for a limited purpose. It was not received, and you may not consider it, to prove the character of the defendant in order to show that he acted in (conformity) (accordance) with that character. If you find that the evidence of other (crime[s]) (wrong[s]) (act[s]) is true and that the defendant committed (it) (them), you may consider that evidence only for the purpose of deciding whether it proves * * *
>
> (e) (describe other purposes).

The court's description of the "other purposes" under paragraph (e) was as follows: "that which was sought to be proved under those circumstances." Appellant argues that this phrase is so ambiguous as to be meaningless, thereby allowing the jury to consider appellant's "other acts" (which the parties agree are his prior drug-related activities) for any purpose that it saw fit. He maintains that this caused him material

prejudice because it cannot be assumed that the jury did not consider his other acts as tending to prove his propensity to commit the acts giving rise to the charges against him.

In response, the State argues that the jury instructions clearly indicated that the jury was permitted to consider evidence of appellant's drug use and trafficking only to prove the issue for which this other acts evidence was admitted. The evidence relating to appellant's drug use demonstrated that he was present at the 11th Avenue house several days before the murders and it demonstrated why he was present at the house on the night of the murders; it also demonstrated that appellant was acquainted with many of the witnesses through his involvement in drugs. According to the State, it was clear to the jury that there was no other purpose for the other acts evidence.

"Trial courts are not required * * * to characterize evidence or to instruct juries as to the category into which certain evidence fits." *State v. Skatzes*, 104 Ohio St.3d 195, 819 N.E.2d 215, 2004–Ohio–6391, ¶ 64. To require the court to enumerate the other acts and identify the evidence of those acts would "require that the trial court usurp the jury's function as the finder of fact." *Ibid.* Moreover, "[a]ny ambiguity in a selected portion of the instructions does not constitute reversible error unless the instructions, as a whole are so misleading as to prejudicially affect a substantial right of the complaining party." *State v. Chapman* (Feb. 2, 2002), 8th Dist. No. 79607, 2002 Ohio App. LEXIS 459, at *17–18, 2002 WL 207613 [at *6] citing *Kokitka v. Ford Motor Co.* (1995), 73 Ohio St.3d 89, 92–93, 652 N.E.2d 671. Though the court's description of the "other purposes" for which the other acts evidence could be used is not a model of clarity, it nonetheless conveys that such evidence was only to be used to decide whether it proved "that which was sought to be proved" in each circumstance in which such evidence was offered (e.g., that appellant shopped for drugs at the East 11th Ave. home in the days before the murders, that appellant trafficked in drugs with many of the witnesses.) We are unpersuaded that the court's instruction, taken as a whole, was misleading or confusing.

More importantly, however, even if the court's instruction does constitute error, appellant cannot show that it affected the outcome of his trial. The jury was presented with the testimony of two people who were engaged with appellant in an armed robbery on the night of the shootings, who were present with appellant moments before he shot the victims, and to whom appellant said he "had to do it." The jury also heard from several witnesses (Radcliff, Runyan and Patterson) to whom appellant allegedly confessed. In addition, appellant admitted that he had been to the East 11th Ave. home several days prior to the shootings to look at some drugs in contemplation of purchasing them. The evidence against appellant was overwhelming; thus, any error in instructing the jury on the proper treatment of "other acts" evidence did not affect the outcome of the trial.

Appellant argues that the trial court committed plain error in failing to read to the jury the instructions for each separate count of kidnapping and for each separate count of aggravated murder, and that he received ineffective assistance when counsel failed to object. The record reveals that the trial court explained to the jury that there were two counts of aggravated murder corresponding to each victim for a total of six counts of aggravated murder. The court also explained that there was one

count of kidnapping corresponding to each victim for a total of three counts of kidnapping. The court further instructed the jury as to the definitions of each of the elements of aggravated murder and of kidnapping. The court explained:

Ohio has different levels of murder. And they start off with murder, which is the purposely causing the death of another. That's murder.

Then if you add to murder prior calculation and design, that becomes aggravated murder. Or if you add to murder, while committing aggravated burglary, aggravated robbery and/or kidnapping, that amounts to aggravated murder.

So we have one count with each victim of murder plus prior calculation and design leading to that and we have a second count dealing with the same victim, being murder, purposely causing the death of another, plus this [referring to visual aid], leading to aggravated murder. So that's how we get six counts.

Now, in each one of the six counts, we have what are called specifications. And I'll go through those with you. * * *

But I'm going to go through these with you. And I'm not going to repeat them six times. I'm just going to go through-and obviously we are dealing with three victims and two different counts.

Aggravated murder. Before you can find the defendant guilty, you must find the State has proved beyond a reasonable doubt that on or about July 23, 2003, in Franklin County, Ohio, that the defendant, Vernon Spence, was 18 years old or more at the time, and as I said, it's alleged that he was the principal offender, that he purposely-and either, with calculation and design to cause the death, one, in Counts One, Kayla Hurst, Count Three, Eric Hlass and Count Five, Aaron Grexa.

Purposely with prior calculation and design caused the death of another. That's those three counts. Or in Counts Two, Four and Six that the defendant, on or about July 23, 2003, in Franklin County, Ohio, that he was 18 years of age or older and he was the principal offender and that he purposely caused the death of another while committing the offenses of kidnapping, aggravated robbery and/or aggravated burglary. * * *

Kidnapping. There are three counts of kidnapping dealing with each victim. Count Ten deals with Miss Hurst-pardon me-Count Nine deals with Miss Hurst, Count Ten deals with Mr. Hlass and Count Eleven deals with Mr. Grexa. * * *

As I said, the verdict forms are dealing with each count. I'm going to go through one and explain it to you because there is one thing I have not gone over with you.

(Tr., 889, 891–892, 901, 907.)

Appellant does not cite any authority in support of his argument that it is error for a court to instruct a jury only once as to an offense with which a defendant has been charged multiple times, and we are unaware of any such authority. "It is fundamental that jury instructions must be considered as a whole." *State v. Jackson* (2001), 92 Ohio St.3d 436, 446, 751 N.E.2d 946. When the jury instructions in this case are read as a whole, we find no error in the charge. Therefore, we reject appellant's argument that defense counsel's failure to object to this instruction constituted ineffective assistance of counsel.

Appellant also argues that the court committed plain error in failing to separately read to the jury the verdict forms corresponding to each count of aggravated murder, and in failing to read to the jury any of the verdict forms corresponding to the counts of aggravated robbery, aggravated burglary and kidnapping. He also claims he received ineffective assistance of counsel when counsel failed to object to the fact that the court did not read each and every verdict form to the jury. He states that because of the court's failure to read each verdict form separately the jury did not fully understand its duty to consider each and every count in the indictment as they related separately to each victim. Appellant cites no authority in support of his position that error occurred.

The record reveals that the trial court explained:

On the verdict forms I differentiate not only the victim, but I differentiate how the theory of aggravated murder is.

So on Count One it says Kayla Hurst, parens prior calculation and design. And the next one on Count Two says Kayla Hurst while committing the offenses of aggravated burglary, aggravated robbery and kidnapping. So you can tell those differences.

(Tr., 896.)

There is no indication in the record that the jury did not understand its duty to consider every count in the indictment separately with respect to each victim. We conclude that the trial court committed no error in failing to separately read to the jury each verdict form. Accordingly, counsel was not ineffective for failing to object to the way in which the court instructed the jury regarding the verdict forms.

Appellant further argues that the trial court committed plain error in failing to charge the jury on the lesser included offense of murder until after the jury had begun to deliberate. Appellant also argues that his counsel was ineffective for failing to object to the trial court's failure to instruct on the lesser included offense before the jury retired to deliberate. Appellant concedes that the court's instruction was complete and he does not specifically state how the timing of the instruction constituted error, or how such error, if any, prejudiced him, except to argue that the jury deliberated for two hours without the definition of murder.

The record reveals that the court included within its pre-deliberation instructions to the jury an instruction that the jury could find appellant not guilty of any count of aggravated murder but guilty of the lesser included offense of murder. Also at that time, as reprinted supra, at ¶ 87, the court defined the lesser included offense of murder as "purposely causing the death of another[.]" When the jury returned from its lunch break, the court told the jury that it would be receiving a transcript of the jury instructions for its use during deliberations, as well as some audiovisual equipment with which it could replay audio- and videotape evidence. In addition, the court stated:

Now, one other thing I didn't say specifically, even though I did tell you, is that if you get to the point where you're dealing with the lesser included offense of murder, before you can find the defendant guilty of a lesser included offense of murder, you must find the State has proved beyond a reasonable doubt that on or about July 23, 2003, in Franklin County, Ohio, that the defendant purposely caused the death of another. And that's one of

the three victims and that all six of the lesser included offenses.

I told you murder was the purposely causing the death of another, but I didn't tell you specifically what they have to prove beyond a reasonable doubt.

So now that I've done that, go ahead and step back in there.

(Tr., 920–921.)

Many Ohio courts of appeals have held that, as a general principle, supplemental instructions to a jury after deliberations have begun are not per se prejudicial. *See e.g., State v. Hicks* (Mar. 26 [Apr. 19], 1990), 2nd Dist. No. 11567 [1990 WL 51500] ("Supplemental instructions to a jury after deliberations have begun are not per se prejudicial."); *State v. Hairston* (1977), 60 Ohio App.2d 220, 225, 14 O.O.3d 191, 396 N.E.2d 773; *State v. McGrath* (Nov. 19, 1985), 4th Dist. No. 1218 [1985 WL 17457]; *State v. Fannin* (Oct. 9, 1987), 6th Dist. No. OT–87–9 [1987 WL 18135] ("It is an appropriate action for the trial court to recall a jury to give them a corrected instruction."); *State v. Taylor* (Aug. 5, 1976), 8th Dist. No. 35109 [1976 WL 191075]; *State v. Golden Charities, Inc.* (May 24, 1978), 9th Dist. No. 8639 [1978 WL 215202]; *State v. Morgan* (Sept. 30, 1991), 11th Dist. No. 90–A–1554 [1991 WL 206739] ("[A] trial judge may give additional instructions after the jury has begun deliberating."); *see, also, State v. Moorehead* (May 9, 1996), 10th Dist. No. 95APA09–1116 [1996 WL 239643].

"If from the entire charge it appears that a correct statement of the law was given in such a manner that the jury could not have been misled, no prejudicial error results." *State v. Hardy* (1971), 28 Ohio St.2d 89, 92, 57 O.O.2d 284, 276 N.E.2d 247. In the present case, the court gave the jury a complete and correct instruction on the lesser included offense of murder, and did so in such a manner that the jury could not have been misled. Accordingly, we find no prejudicial error and thus no plain error or ineffective assistance of counsel. *State v. Spence, supra,* 2006 WL 3438668.

■ Petitioner has waived his right to present, in these habeas corpus proceedings, his claims of alleged plain error. The United States Court of Appeals for the Sixth Circuit has held that plain error review does not constitute a waiver of the state's procedural default rules. *Seymour v. Walker,* 224 F.3d 542, 557 (6th Cir.2000). As explained by the United States District Court for the Northern District of Ohio:

Ohio has a contemporaneous objection rule under which an appellant who fails to object waives later review of the issue unless plain error can be shown. *Williams v. Bagley,* 380 F.3d 932, 968 (6th Cir.2004), *cert. denied,* 544 U.S. 1003, 125 S.Ct. 1939, 161 L.Ed.2d 779 (2005) (citing *State v. Smith,* 89 Ohio St.3d 323, 332, 731 N.E.2d 645 (2000)). The Sixth Circuit has held that Ohio's contemporaneous objection rule constitutes an adequate and independent state ground barring federal review absent a showing of cause for the waiver and resulting prejudice. *Id.; Hinkle v. Randle,* 271 F.3d 239, 244 (6th Cir.2001); *Stojetz v. Ishee,* 2006 WL 328155 *12 (S.D.Ohio Feb. 10, 2006).

A state court's review of an issue for plain error is considered by the Sixth Circuit as the enforcement of a procedural default. *Williams,* 380 F.3d at 968; *Hinkle,* 271 F.3d at 244. The federal court, in determining whether a state court has relied on a procedural rule to bar review of an issue, examines the latest reasoned opinion of the state courts and presumes that later courts enforced the bar instead of rejecting the claim on the merits. *Hinkle,* 271 F.3d at 244 (citing *Ylst v. Nunnemaker,* 501

U.S. 797, 803, 111 S.Ct. 2590, 115 L.Ed.2d 706 (1991)).

*Adams v. Bradshaw,* 484 F.Supp.2d 753, 771 (N.D.Ohio 2007). This Court therefore likewise concludes that petitioner has waived the right to present claim five in these habeas corpus proceedings.

■■■■ As cause for his procedural default, this Court presumes that petitioner asserts the ineffective assistance of counsel, which issue he presents in claim four. *See Edwards v. Carpenter,* 529 U.S. 446, 452–53, 120 S.Ct. 1587, 146 L.Ed.2d 518 (2000), citing *Murray v. Carrier,* 477 U.S. 478, 488–89, 106 S.Ct. 2639, 91 L.Ed.2d 397 (1986)(ineffective assistance of counsel may constitute cause for procedural default). The right to counsel guaranteed by the Sixth Amendment is the right to effective assistance of counsel. *McMann v. Richardson,* 397 U.S. 759, 771 n. 14, 90 S.Ct. 1441, 25 L.Ed.2d 763 (1970). The standard for reviewing a claim of ineffective assistance of counsel is twofold:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

*Strickland v. Washington,* 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); *see also Blackburn v. Foltz,* 828 F.2d 1177 (6th Cir.1987). "Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *Strickland,* 466 U.S. at 689, 104 S.Ct. 2052.

■■■■ To establish prejudice, it must be shown that there is a reasonable probability that, but for counsel's errors, the result of the proceedings would have been different. *Id.,* at 694, 104 S.Ct. 2052. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.,* at 697, 104 S.Ct. 2052. Because petitioner must satisfy both prongs of the *Strickland* test to demonstrate ineffective assistance of counsel, if the Court determines that petitioner has failed to satisfy one prong, it need not consider the other. *Id.,* at 697, 104 S.Ct. 2052.

For the reasons discussed by the state appellate court, this Court agrees that petitioner has failed to establish prejudice arising from counsel's failure to object to any of the foregoing alleged errors. Petitioner has failed to show that the state appellate court's decision rejecting his claim of ineffective assistance of counsel was so unreasonable as to justify federal habeas corpus relief. *See Williams v. Taylor, supra.* Claim four is without merit. Petitioner has therefore failed to establish cause and prejudice for his procedural default of claim five.

### CLAIMS SIX AND TWELVE

In claims six and twelve, petitioner asserts that imposition of maximum consecutive sentences violated *Blakely v. Washington,* 542 U.S. 296, 124 S.Ct. 2531, 159 L.Ed.2d 403 (2004), because he was a first time offender. The state appellate court reviewed this claim for plain error only, rejecting the claim as follows:

> [A]ppellant argues that, pursuant to the holdings of the United States Supreme Court in *Apprendi v. New Jersey* (2000), 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435, and *Blakely v. Washington* (2004), 542 U.S. 296, 124 S.Ct. 2531, 159

L.Ed.2d 403, the trial court committed reversible error in sentencing appellant to maximum sentences for his aggravated robbery, aggravated burglary and kidnapping convictions, and in ordering that all sentences be served consecutively, based upon facts not found by a jury beyond a reasonable doubt.

In the case of *State v. Foster*, 109 Ohio St.3d 1, 2006–Ohio–856, 845 N.E.2d 470, "the Supreme Court of Ohio determined that portions of this state's sentencing statutes violate the Sixth Amendment to the United States Constitution in the manner set forth in *Apprendi v. New Jersey* (2000), 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435, and *Blakely, supra.*" *State v. Draughon*, 10th Dist. No. 05AP–860, 2006–Ohio–2445, ¶ 5 [2006 WL 1351607]. "As a result of *Foster*, the offending provisions of Ohio's sentencing statutes were severed with the result that trial courts now 'have full discretion to impose a prison sentence within the statutory range and are no longer required to make findings or give their reasons for imposing maximum, consecutive, or more than minimum sentences.'" *State v. Hughes*, 10th Dist. No. 05AP–1286, 2006–Ohio–5411, ¶ 24 [2006 WL 2948077], quoting *Foster, supra,* at paragraph seven of the syllabus.

Appellant recognizes the holding in *Foster*, but argues that R.C. 2929.14(B), (C) and (E) should be strictly construed against the state and, thus, the Supreme Court of Ohio in *Foster* erred in excising the entirety of these statutes. Therefore, he argues, the portions of these statutes that require that those who have never before served a prison term must be given minimum and non-consecutive sentences should still be applied in this case, and we should remand the case, pursuant to *Foster*, and require that the trial court support any non-minimum and consecutive sentences with the appropriate findings required

by the language of the statutes that *Foster* excised.

The record discloses that appellant never raised the *Blakely* issue in the trial court and he has therefore waived the issue on appeal. *Draughon, supra*, at ¶ 7–8; *see, also, State v. Jordan*, 10th Dist. No. 05AP–1330, 2006–Ohio–5208, ¶ 41 [2006 WL 2808173]. Even if he had preserved this issue, we would be bound to apply *Foster* as it was written. *Sant v. Hines Interests Ltd. Partnership*, 10th Dist. No. 05AP–586, 2005–Ohio–6640, ¶ 19 [2005 WL 3435853] ("[W]e [are] bound to follow precedent set by the Supreme Court[.]") For these reasons, appellant's sixth assignment of error is overruled.

*State v. Spence, supra*, 2006 WL 3438668. Respondent contends that petitioner's *Blakely* claim is procedurally defaulted.

Petitioner was sentenced on July 29, 2005, after the United States Supreme Court's June 24, 2004, decision in *Blakely*, but prior to the Ohio Supreme Court's February 26, 2006, decision in *State v. Foster*, 109 Ohio St.3d 1, 845 N.E.2d 470 (2006)(invalidating fact-finding provisions of Ohio's sentencing statutes as unconstitutional under *Blakely*). The appellate court affirmed his convictions on November 30, 2006, and the Ohio Supreme Court dismissed petitioner's appeal on April 18, 2007.

Although the state appellate court refused to consider the merits of petitioner's *Blakely* claim because petitioner failed to object at sentencing, it does not appear that the Ohio courts consistently required such an objection at sentencing to preserve a *Blakely* error for appellate review, at least at the time of petitioner's appeal and in regard to defendants who, like petitioner, were sentenced after *Blakely* but whose case remained pending on appeal at the time *Foster* was decided.

In *Foster*, the Ohio Supreme Court remanded all cases then pending on direct review. *State v. Foster, supra*, 109 Ohio St.3d at 31, 845 N.E.2d 470. The issue whether a defendant was required to assert a contemporaneous objection that his sentence violated *Blakely* was not before the Supreme Court in *Foster* and was not addressed in that case. Following *Blakely*, Ohio appellate courts were divided on whether a failure to raise a *Blakely* objection at sentencing precluded appellate review of that claim. For example, the Ohio Seventh District Court of Appeals in *State v. Scranton Buchanan*, 2006 WL 3059911 (Ohio App. 7th Dist. October 26, 2006), declined to adopt that rule. On the other hand, the Sixth Appellate District has taken the opposite view. *State v. Brinkman*, 6th Dist. No. WD–05–058, 2006–Ohio3868, 168 Ohio App.3d 245, 859 N.E.2d 595. The Ohio Supreme Court resolved this conflict in *State v. Payne*, 114 Ohio St.3d 502, 506, 873 N.E.2d 306 (2007), holding that a defendant sentenced after *Blakely* who failed to raise the objection at sentencing forfeited the error for appellate review. The defendant in *Payne* was in the same circumstances as petitioner Spence: he was sentenced after *Blakely* but made no *Blakely* objection at sentencing; his appeal was pending when *Foster* was decided.

 The Supreme Court of Ohio acknowledged in *Payne* that it remanded a number of cases on its docket that raised *Blakely* issues without addressing whether Ohio's contemporaneous objection rule barred appellate review:

> In *Foster* and similar appellate cases, we remanded a large number of cases already in the appellate phase for resentencing hearings without any mention of forfeiture. *Foster*, 109 Ohio St.3d 1, 2006–Ohio–856, 845 N.E.2d 470, ¶ 3–7. The remand orders were silent as to the issue currently confronting us.

> We recognize that this court remanded for resentencing some cases in which the initial sentencing by the trial court had occurred after *Blakely* was decided, but where the defendant had seemingly failed to object on *Blakely* grounds to the sentence imposed. *See, e.g., State v. Kendrick*, 2d Dist. No. 20965, 2006–Ohio–311, 2006 WL 202141, judgment reversed by *In re Ohio Criminal Sentencing Statutes Cases*, 109 Ohio St.3d 411, 2006–Ohio–2394, 848 N.E.2d 809, ¶ 19. However, this court did not then definitively resolve the issue presented by this case; thus, it is appropriate to do so now.

*State v. Payne, supra*, 114 Ohio St.3d at 504, 873 N.E.2d 306 (footnote omitted). According to the Supreme Court of Ohio, "[a] reported decision, although a case where the question might have been raised, is entitled to no consideration whatever as settling * * * a question not passed upon or raised at the time of the adjudication." *Id.*, quoting *State ex rel. Gordon v. Rhodes* (1952), 158 Ohio St. 129, 107 N.E.2d 206, paragraph one of the syllabus.

> Thus, we are not bound by any perceived implications that may have been inferred from *Foster*. *Cf. Lopez v. Monterey Cty.* (1999), 525 U.S. 266, 281, 119 S.Ct. 693, 142 L.Ed.2d 728; *see, also, State ex rel. United Auto., Aerospace & Agricultural Implement Workers of Am. v. Bur. of Workers' Comp.*, 108 Ohio St.3d 432, 2006–Ohio–1327, 844 N.E.2d 335, ¶ 46.

*Payne*, 114 Ohio St.3d at 504, 873 N.E.2d 306. The Ohio Supreme Court expressly held that a failure to object at sentencing waived *Blakely* error:

> We are guided by *United States v. Booker* (2005), 543 U.S. 220, 125 S.Ct. 738, 160 L.Ed.2d 621. *Booker*, like *Foster*, applied to every case that was in the

appellate stage. *Id.* at 268, 125 S.Ct. 738, 160 L.Ed.2d 621. The United States Supreme Court, however, noted that not every case would be entitled to a resentencing hearing. Instead, *Booker* instructed courts "to apply ordinary prudential doctrines, determining, for example, whether the issue was raised below and whether it fails the 'plain-error' test." *Id.* Because *Blakely* was announced prior to Payne's plea and sentence, and because we conclude that the error is not structural, in failing to make a *Blakely* objection, Payne forfeited the issue for appellate purposes.

*State v. Payne, supra,* 114 Ohio St.3d at 504–05, 506, 873 N.E.2d 306.

■ In any event, and as noted by the state appellate court, petitioner presented his *Blakely* claim on direct appeal only as an issue of state law, *i.e.,* contending that O.R.C. § 2901.04(A) mandated that Ohio statutes be liberally construed in favor of the accused, that the Ohio Supreme Court in *Foster* had erred in excising fact-finding provisions of Ohio sentencing statutes, and that petitioner was therefore entitled to be re-sentenced to minimum concurrent terms of incarceration. *See Exhibit 4 to Return of Writ.* Therefore, petitioner failed to present to the state courts the federal issue he now raises in this habeas corpus petition. Again, he has failed to establish cause for this failure. He has therefore failed to preserve his *Blakely* claim for federal habeas corpus review.

■ To the extent that petitioner raises an issue regarding an alleged violation of state law, such claim fails to warrant federal habeas corpus relief. A federal court may review a state prisoner's habeas petition only on the ground that the challenged confinement is in violation of the Constitution, laws or treaties of the United States. 28 U.S.C. § 2254(a). A federal court may not issue a writ of habeas corpus "on the basis of a perceived error of state law." *Pulley v. Harris,* 465 U.S. 37, 41, 104 S.Ct. 871, 79 L.Ed.2d 29 (1984); *Smith v. Sowders,* 848 F.2d 735, 738 (6th Cir.1988). A federal habeas court does not function as an additional state appellate court reviewing state courts' decisions on state law or procedure. *Allen v. Morris,* 845 F.2d 610, 614 (6th Cir.1988). " '[F]ederal courts must defer to a state court's interpretation of its own rules of evidence and procedure' " in considering a habeas petition. *Id.* (quoting *Machin v. Wainwright,* 758 F.2d 1431, 1433 (11th Cir.1985)). Only where the error resulted in the denial of fundamental fairness will habeas relief be granted. *Cooper v. Sowders,* 837 F.2d 284, 286 (6th Cir.1988). Such are not the circumstances here.

■ Further, assuming *arguendo* that petitioner's *Blakely* claim is properly before this Court, the record fails to reflect prejudice from any *Blakely* error. *See Washington v. Recuenco,* 548 U.S. 212, 126 S.Ct. 2546, 165 L.Ed.2d 466 (2006) (A *Blakely* violation is subject to harmless error review).

To establish harmless error such that this Court lets stand a defendant's sentence in spite of errors at trial or sentencing below, the government must "prove that none of the defendant's substantial rights [has] been affected by the error." *United States v. Oliver,* 397 F.3d 369, 381 (6th Cir.2005) (citing Fed. R.Crim.P. 52(a)); *United States v. Barnett,* 398 F.3d 516, 530 (6th Cir.2005). *See also Arizona v. Fulminante,* 499 U.S. 279, 296, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991) (noting that the government bears the burden of proof on harmless error); *United States v. Olano,* 507 U.S. 725, 734, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993) (same). To carry this burden, the government must demonstrate to this Court with certainty that the error at sentencing did not

"cause[ ] the defendant to receive a more severe sentence." *Oliver,* 397 F.3d at 379 (internal citation omitted); *United States v. Hazelwood,* 398 F.3d 792, 801 (6th Cir.2005) ("Under the harmless error test, a remand for an error at sentencing is required unless we are certain that any such error was harmless.") (emphasis added). *United States v. Johnson,* 467 F.3d 559 (6th Cir.2006).

The trial court sentenced petitioner to three consecutive life terms without possibility of parole on three counts of aggravated murder with death penalty specifications. *See Exhibit 1 to Return of Writ.* Rather than recommending the death penalty, the jury rendered a verdict, after hearing evidence on mitigating circumstances, recommending that petitioner be sentenced to life imprisonment without possibility of parole, which sentence the trial court imposed pursuant to statute. *See Exhibits 6, 7 to Return of Writ;* O.R.C. § 2929.03(D). Therefore, the trial court's imposition of three terms of life imprisonment without possibility of parole did not violate *Blakely.* Further, imposition of consecutive terms of incarceration did not violate *Blakely. Oregon v. Ice,* —— U.S. ——, 129 S.Ct. 711, 714–15, 172 L.Ed.2d 517 (2009) (6th Amendment does not preclude judicial fact finding as a basis for imposition of consecutive sentences). In view of the foregoing sentences, any *Blakely* error in the trial court's imposition sentence on petitioner's remaining convictions constituted harmless error. *See Washington v. Recuenco, supra.*

For all the foregoing reasons, claims six and twelve lack merit.

### CLAIMS SEVEN AND THIRTEEN

In claims seven and thirteen, petitioner asserts that the trial court committed reversible error when it failed to merge three charges of kidnapping and the ag-

gravated robbery convictions for purposes of sentencing. The state appellate court rejected this claim as follows:

[A]ppellant argues that the trial court erred in failing to merge the three kidnapping counts into the aggravated robbery count for purposes of sentencing. Specifically, he contends that the kidnappings were only committed to facilitate the aggravated robbery and that there was, therefore, no animus for the kidnappings that was separate and distinct from the animus for the aggravated robbery. In response, the state argues that kidnapping and aggravated robbery are not allied offenses of similar import and appellant committed the kidnappings with a separate animus from that with which he committed the aggravated robbery.

Section 2941.25 of the Ohio Revised Code, Ohio's allied offense statute, protects against multiple punishments for the same criminal conduct, which could violate the Double Jeopardy Clauses of the United States and Ohio constitutions. It provides, as follows:

(A) Where the same conduct by defendant can be construed to constitute two or more *allied offenses of similar import,* the indictment or information may contain counts for all such offenses, but the defendant may be convicted of only one.

(B) Where the defendant's conduct constitutes two or more offenses of dissimilar import, or where this conduct results in two or more offenses of the same or similar kind committed separately or with a separate *animus* as to each, the indictment or information may contain counts for all such offenses, and the defendant may be convicted of all of them.

In the case of *State v. Rance* (1999), 85 Ohio St.3d 632, 710 N.E.2d 699, the Su-

preme Court of Ohio held that analysis under R.C. 2941.25 is a two-step process. First, courts must compare, in the abstract, the statutorily defined elements of offenses that are claimed to be of similar import. *Id.* at 638, 710 N.E.2d 699. "Courts should assess, by aligning the elements of each crime in the abstract, whether the statutory elements of the crimes 'correspond to such a degree that the commission of one crime will result in the commission of the other.'" *Ibid.*, quoting *State v. Jones* (1997), 78 Ohio St.3d 12, 14, 676 N.E.2d 80. "[I]f the elements do so correspond, the defendant may not be convicted of both unless the court finds that the defendant committed the crimes separately or with separate animus." *Id.* at 638–639, 676 N.E.2d 80.

We begin our analysis with the first step under *Rance.* Appellant was convicted of aggravated robbery in violation of R.C. 2911.01(A), which provides, in relevant part:

No person, in attempting or committing a theft offense, as defined in section 2913.01 of the Revised Code, or in fleeing immediately after the attempt or offense, shall do any of the following:

(1) Have a deadly weapon on or about the offender's person or under the offender's control and either display the weapon, brandish it, indicate that the offender possesses it, or use it[.]

Appellant was also convicted of three counts of kidnapping in violation of R.C. 2905.01(A), which provides, in relevant part:

No person, by force, threat, or deception, or, in the case of a victim under the age of thirteen or mentally incompetent, by any means, shall remove another from the place where the other person is found or restrain the liberty of the other person, for any of the following purposes:

(1) To hold for ransom, or as a shield or hostage;

(2) To facilitate the commission of any felony or flight thereafter[.]

In *State v. Logan* (1979), 60 Ohio St.2d 126, 14 O.O.3d 373, 397 N.E.2d 1345, the Supreme Court of Ohio compared the elements of the two statutes and held that implicit within every robbery (and, thus, aggravated robbery) is a kidnapping. *Id.* at 130, 397 N.E.2d 1345. This means that kidnapping and aggravated robbery are allied offenses of similar import and appellant may not be punished separately for these offenses unless he committed them with a separate animus.

Therefore, in order to determine whether the trial court should have merged appellant's kidnapping convictions with his aggravated robbery conviction, we must proceed to the second step of the *Rance* analysis. The word "animus" in R.C. 2941.25 means purpose or immediate motive. *Id.* at 131, 397 N.E.2d 1345. We must determine whether appellant committed the kidnappings of Hurst, Grexa and Hlass with a separate purpose or immediate motive from that with which he committed aggravated robbery.

With respect to what would later become the second step of the *Rance* analysis, the *Logan* court held, at the syllabus:

In establishing whether kidnapping and another offense of the same or similar kind are committed with a separate animus as to each pursuant to R.C. 2941.25(B), this court adopts the following guidelines:

(a) Where the restraint or movement of the victim is merely incidental to a separate underlying crime, there exists no separate animus sufficient to sustain separate convictions; however,

where the restraint is prolonged, the confinement is secretive, or the movement is substantial so as to demonstrate a significance independent of the other offense, there exists a separate animus as to each offense sufficient to support separate convictions; (b) Where the asportation or restraint of the victim subjects the victim to a substantial increase in risk of harm separate and apart from that involved in the underlying crime, there exists a separate animus as to each offense sufficient to support separate convictions.

In the present case, though appellant's initial restraint of the victims facilitated the aggravated robbery, it was not merely incidental thereto. Appellant and his cohorts corralled the victims into two separate bedrooms and then, later, onto the floor of the same bedroom, and bound their hands and feet with speaker wire, *after* one of the victims had led the trio to the drugs and money that they sought through commission of the aggravated robbery. Thus, the restraint was extreme and prolonged and it substantially increased the terror and risk of harm to which the victims were exposed. It is clear that the kidnappings were committed with an animus that was independent from that with which the aggravated robbery was committed. Thus, the trial court did not err in refusing to merge the kidnapping counts into the aggravated robbery count. Accordingly, appellant's seventh assignment of error is overruled.

State v. Spence, *supra*, 2006 WL 3438668.

 The Double Jeopardy Clause of the Fifth Amendment, made applicable to the states through the Fourteenth Amendment, provides that no person shall "be subject for the same offence to be twice put in jeopardy of life or limb." U.S. Const. amend. V. The clause has been interpreted as protecting criminal defendants from successive prosecutions for the same offense after acquittal or conviction, as well as from multiple punishments for the same offense. *Brown v. Ohio*, 432 U.S. 161, 165, 97 S.Ct. 2221, 53 L.Ed.2d 187 (1977). The traditional test for double jeopardy claims is the "same elements" test set forth in *Blockburger v. United States*, 284 U.S. 299, 304, 52 S.Ct. 180, 76 L.Ed. 306 (1932) (requiring the court to determine whether each charged offense "requires proof of an additional fact which the other does not"). The *Blockburger* test is designed to deal with the situation where closely connected conduct results in multiple charges under separate statutes. Under *Blockburger*, the critical question is whether the multiple charges in reality constitute the same offense. Thus, the *Blockburger* test focuses on whether the statutory elements of the two crimes charged are duplicative. If the elements of the two statutes are substantially the same, then double jeopardy is violated by charging the defendant under both.

 Respondent contends that petitioner presents an issue of state law that is not appropriate for federal habeas corpus review. *Return of Writ*, at 55. This Court does not agree. As discussed in *Palmer v. Haviland*, 2006 WL 1308219 (S.D.Ohio May 11, 2006), Ohio's statute relating to allied offenses, O.R.C. 2941.25, as defined by the Ohio Supreme Court in *State v. Rance*, *supra*, is based on concerns arising from the Double Jeopardy Clause.

*Rance* involved the branch of the Double Jeopardy Clause that protects against multiple punishments for the same offense in relation to Ohio's "allied offenses" statute, Ohio Rev.Code § 2941.25. The defendant in *Rance* argued that the imposition of cumulative punishments in a single trial for two

separate offenses that the defendant claimed constituted the same offense violated the Double Jeopardy Clause. The Supreme Court of Ohio addressed the specific issue of whether "R.C. 2941.25(A) and the constitutional protections against double jeopardy prohibit trial courts from imposing separate sentences for both involuntary manslaughter and aggravated robbery." 85 Ohio St.3d at 634, 710 N.E.2d at 702. The Ohio Supreme Court recognized that "the double jeopardy protections afforded by the federal and state Constitutions guard citizens against ... cumulative punishments for the 'same offense.'" *Rance,* 85 Ohio St.3d at 634, 710 N.E.2d at 702. The Ohio Supreme Court noted that "the Fifth Amendment's Double Jeopardy Clause (made applicable to the states by the Fourteenth Amendment) and Ohio's counterpart are sufficiently similar to warrant consultation of federal jurisprudence when analyzing Ohio's proscription against placing persons 'twice ... in jeopardy for the same offense.'" *Id.* The Rance Court went on to analyze United States Supreme Court precedent on double jeopardy, including the decision in *Blockburger v. United States,* 284 U.S. 299 [52 S.Ct. 180, 76 L.Ed. 306] (1932) .... [and] ultimately determined that the Ohio legislature could prescribe imposition of cumulative punishments for crimes stemming from the same criminal act "without violating the federal protection against double jeopardy or corresponding provisions of a state's constitution." 85 Ohio St.3d 632, 635, 710 N.E.2d 699, 702 citing *Albernaz* [*v. United States* ], 450 U.S. [333] at 344 [101 S.Ct. 1137, 67 L.Ed.2d 275 (1981)].

*Id. See also Hill v. Sheets,* 627 F.Supp.2d 810 (S.D.Ohio 2008). However, in view of the facts of this case, and applying the test set forth in *Blockburger,* this Court is not persuaded that the state appellate court's conclusion that evidence reflected separate criminal acts due to the prolonged restraint and movement of the victims and that petitioner's convictions therefore did not violate the Double Jeopardy Clause was unreasonable so as to justify federal habeas corpus relief. 28 U.S.C. 2254(d), (e); *Williams v. Taylor, supra; see Jones v. Baker,* 35 F.3d 566, unpublished, 1994 WL 464191 (6th Cir. August 26, 1994) (no double jeopardy violation where kidnapping not "merely incidental" to aggravated robbery and involved substantial restraint of the victim); *Watkins v. Schotten,* 103 F.3d 132, unpublished, 1996 WL 690159 (6th Cir. November 27, 1996) (no double jeopardy violation on aggravated robbery and kidnapping convictions where the offenses were committed separately with separate animus and since the crimes have separate elements); *McKitrick v. Smith,* 2009 WL 1067321 (N.D. Ohio April 21, 2009) (trial court's finding that petitioner had "separate animi" for robbery and kidnapping is due deference in habeas proceedings and therefore petitioner's convictions did not violate *Blockburger* ).

Therefore, claims seven and thirteen are without merit.

### CLAIMS EIGHT AND NINE

In claim eight, petitioner alleges that he was denied a fair trial due to prosecutorial misconduct by use of confidential informant Troy Patterson, who "entrapped" petitioner, and prosecution witness Donald Richardson, who was offered a reduction in his sentence in exchange for testifying against petitioner. Petitioner also asserts that he had the right to counsel when Patterson obtained incriminating statements from him. In claim nine, petitioner alleges that he was denied the effective assistance of trial counsel because his attorneys failed to interview inmates at the county jail, *i.e.,*

Justen Pumme and Jausha Webb, who would have testified that petitioner was "used as a scapegoat and wrongfully convicted." Petitioner has waived this Court's consideration of these claims.

To the extent that these claims are readily apparent from the face of the record, the claims should have been raised on direct appeal, but were not. Further, petitioner may now no longer present such claims to the state courts under Ohio's doctrine of *res judicata*. *See State v. Cole*, 2 Ohio St.3d 112, 443 N.E.2d 169 (1982); *State v. Ishmail*, 67 Ohio St.2d 16, 423 N.E.2d 1068 (1981); *State v. Perry*, 10 Ohio St.2d 175, 226 N.E.2d 104 (1967). The state courts were never given the opportunity to enforce the procedural rule at issue due to the nature of petitioner's procedural default.

Petitioner first presented the foregoing claims in his petition for post conviction relief. *See Exhibit 11 to Return of Writ.* The state appellate court *sua sponte* dismissed his post conviction appeal when he failed to file an appellate brief. *Exhibit 20 to Return of Writ.* Further, petitioner failed to file a timely appeal of the appellate court's dismissal of his post conviction petition to the Ohio Supreme Court. He may now no longer do so, since Ohio does not permit delayed appeals in post conviction proceedings. Ohio Supreme Court Rule of Practice II, Section 2(A)(4)(c). Again, the Ohio Supreme Court was not given the opportunity to enforce this procedural rule due to the nature of petitioner's procedural default. This Court deems the first and second parts of the *Maupin* test to have been satisfied.

This Court must also decide whether the procedural rules at issue constitute adequate and independent bases upon which to foreclose review of petitioner's federal constitutional claims. This task requires the Court to balance the state's interests behind each procedural rule against the federal interest in reviewing federal claims. *See Maupin v. Smith*, 785 F.2d at 138. Under this analysis, the procedural rules barring claims eight and nine constitute adequate and independent state grounds for denying relief. The state courts must be given a full and fair opportunity to remedy alleged constitutional defects. The time limitations for filing post conviction petitions and the requirement that all available claims be presented at the first opportunity serve the state's interests in finality and in ensuring that claims are adjudicated at the earliest possible opportunity. Further, the doctrine of *res judicata* is stated in unmistakable terms in numerous Ohio decisions and Ohio courts have consistently refused to review claims on the merits under that doctrine. *See State v. Cole, supra; State v. Ishmail, supra; State v. Perry, supra.*

Petitioner can still secure review of these claims on the merits if he demonstrates cause for his failure to follow the state procedural rules as well as actual prejudice from the constitutional violations that he alleges.

> " 'Cause' under the cause and prejudice test must be something external to the petitioner, something that cannot fairly be attributed to him[;] ... some objective factor external to the defense [that] impeded ... efforts to comply with the State's procedural rule." *Coleman v. Thompson*, 501 U.S. 722, 753, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991)

*Maples v. Stegall*, 340 F.3d 433, 438 (6th Cir.2003). Petitioner has failed to establish cause for his procedural defaults relating to these claims.

Beyond the four-part *Maupin* analysis, this Court is required to consider whether this is "an extraordinary case, where a constitutional violation has probably resulted in the conviction of one who is actually innocent." *Murray v. Carrier*, 477

U.S. at 491, 106 S.Ct. 2639; *see also Sawyer v. Whitley,* 505 U.S. 333, 112 S.Ct. 2514, 120 L.Ed.2d 269 (1992). After review of the record, the Court does not deem this to be such a case.

### CLAIMS TEN AND ELEVEN

 In claim ten, petitioner alleges that the trial court abused its discretion by failing to issue findings of fact and conclusions of law when it denied his petition for post conviction relief. In claim eleven, petitioner alleges that state post conviction proceedings are an inadequate remedy. These claims fail to present issues appropriate for federal habeas corpus relief. Errors or deficiencies in post conviction proceedings are not properly considered in habeas corpus proceedings. *Kirby v. Dutton,* 794 F.2d 245, 247 (6th Cir.1986).

Therefore, claims ten and eleven are without merit.

For all the foregoing reasons, the Magistrate Judge **RECOMMENDS** that this action be **DISMISSED.**

If any party objects to this *Report and Recommendation,* that party may, within ten (10) days of the date of this report, file and serve on all parties written objections to those specific proposed findings or recommendations to which objection is made, together with supporting authority for the objection(s). A judge of this Court shall make a *de novo* determination of those portions of the report or specified proposed findings or recommendations to which objection is made. Upon proper objections, a judge of this Court may accept, reject, or modify, in whole or in part, the findings or recommendations made herein, may receive further evidence or may recommit this matter to the magistrate judge with instructions. 28 U.S.C. § 636(b)(1).

The parties are specifically advised that failure to object to the *Report and Recommendation* will result in a waiver of the right to have the district judge review the *Report and Recommendation de novo,* and also operates as a waiver of the right to appeal the decision of the District Court adopting the 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); *United States v. Walters,* 638 F.2d 947 (6th Cir.1981).